UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

Angela Kirby,                              )
                                           )       C/A No.: 4:13-cv-3138-DCN-TER
                 Plaintiff,                )
                                           )
v.                                         )       REPORT AND RECOMMENDATION
                                           )
CAROLYN W. COLVIN,[1] ACTING               )
COMMISSIONER OF SOCIAL                     )
SECURITY,                                  )
                                           )
                 Defendant.                )
_____   )

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended,

42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of

Social Security, denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental

Security Income (SSI). The only issues before the Court are whether the findings of fact are

supported by substantial evidence and whether proper legal standards have been applied. This case

was referred to the undersigned for a report and recommendation pursuant to Local Rule

73.02(B)(2)(a), (D.S.C.).

## I.  RELEVANT BACKGROUND

### A.    Procedural History

By way of background, the Plaintiff, Angela Kirby, filed an application for DIB and SSI on

February 14, 2006, alleging inability to work since September 1, 2004. Her application was denied

at all administrative levels, and upon reconsideration. Plaintiff filed a request for a hearing. A

hearing was held on September 4, 2008, at which time the Plaintiff and a vocational expert (VE)

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

testified. The Administrative Law Judge (ALJ) issued an unfavorable decision on November 19, 2008, finding Plaintiff was not disabled within the meaning of the Act. (Tr.14-21). On June 7, 2010, the Appeals Council considered additional evidence, determined it did not provide a basis for changing the ALJ's decision, and denied Plaintiff's request for review. (Tr. 1-5). The Appeals Council's denial of Plaintiff's request for review made the ALJ's decision the Commissioner's final decision. Plaintiff sought judicial review pursuant to section 205(g) of the Act, 42 U.S.C. § 405(g) on July 30, 2010. By Order of the Court dated February 27, 2012, the decision of the Commissioner was reversed and remanded for further proceedings.

Pursuant to the Court's remand, and a remand from the Appeals Council to the ALJ, a hearing was held on September 25, 2012. The Administrative Law Judge (ALJ) issued an unfavorable decision on April 3, 2013, finding Plaintiff was not disabled within the meaning of the Act. (Tr.529-546).[2] On September 30, 2013, the Appeals Council declined to assume jurisdiction. (Tr. 509-512). Plaintiff filed this action on November 19, 2013, in the United States District Court for the District of South Carolina.

## B.    Plaintiff's Background and Medical History

### 1.    Introductory Facts

Plaintiff was born on September 28, 1969, and was 34 years old at the time of the alleged onset. (Doc. # 16 at p. 4). Plaintiff has a limited education and past relevant work experience as a personal care assistant. (Tr. 609).

---

[2]In her decision, in concluding that her jurisdiction ended in the instant matter with the time period ending June 22, 2010, the ALJ noted that on June 23, 2010, Plaintiff filed a subsequent application for SSI alleging disability beginning on November 18, 2008. The claim was denied initially and upon reconsideration. A hearing was held on November 22, 2011 and by decision dated December 8, 2011, the ALJ issued an unfavorable decision. The Appeals Council denied the claimant's request for review. At the time of the ALJ's decision in the instant case, the June 23, 2010 application was pending judicial review. By Order dated March 25, 2014, the Court affirmed the decision of the Commissioner. See CA No. 4:12-1990, Doc. # 37.

## 2.     Medical Records and Opinions

On June 17, 2005, Robert D. Cox, III, M.D., of Affiliated Counseling and Psychotherapy Centers, Inc., initially evaluated Plaintiff. Dr. Cox's initial diagnosis was adjustment disorder with disturbance of  mood and conduct, chronic depression, moderate obesity, chronic back pain, ulcers, glaucoma, and a GAF of 60. Dr. Cox prescribed Zoloft and Buspar. (Tr. 229-231, 245-246).

On July 1, 2005, Plaintiff returned to see Dr. Cox. She reported trouble sleeping. Dr. Cox noted that her mood and affect were somber. His diagnosis was major depression with anxiety. Dr. Cox continued Plaintiff's prescriptions and started her on Remeron. (Tr 228). On September 12, 2005, Dr. Cox noted that Plaintiff had been fired from work for missing too many days for sickness. (Tr 226-227). On this same date, Plaintiff's counselor noted that she had constricted affect, and an anxious and depressed mood. (Tr. 243).

On September 21, 2005 Marilu Nazareno, M.D., initially evaluated Plaintiff for elevated blood pressure and headaches. Dr. Nazareno noted that Plaintiff was being followed at Affiliated Counseling for depression and although she was doing better, she was still having problems with "lack of desire to do anything" and wanting to "just sleep all day long." Plaintiff complained of fluid retention, being very tired, and gaining weight since starting psychiatric medications. Dr. Nazareno's diagnoses included hypertension –uncontrolled, fatigue, and morbid obesity with BMI of 38%. (Tr 239). On September 28, 2005, Dr. Nazareno reevaluated Plaintiff for continued complaints of headache. Dr. Nazareno's assessment was 1) hypertension –Plaintiff was started on Lotrel and advised to continue Ecotrin; 2) chronic headaches most likely migraine-type –Plaintiff was prescribed Topamax; and, 3) fatigue, positive for anemia. (Tr. 238). On October 31, 2005, Dr. Nazareno reevaluated Plaintiff for her multiple medical conditions, including insomnia and chronic depression. Dr. Nazareno adjusted Plaintiff's medications. (Tr. 237).

3

On November 14, 2005, Dr. Cox noted that Plaintiff was having difficulty with side effects from her medications, and that another physician had prescribed Klonopin. Plaintiff's mood and affect were "a bit stressed" and she was "a little anxious." Dr. Cox increased Plaintiff's Zoloft, stopped the Buspar and Remeron, and started Xanax XR and Ambien. R 225. On December 15, 2005, Dr. Cox reevaluated Plaintiff and reviewed her medications. He indicated that Plaintiff's mood and affect were "a bit distant." (Tr. 224).

On January 11, 2006, Dr. Nazareno evaluated Plaintiff's numerous conditions and rechecked her medications. Dr. Nazareno's assessments included hypertension, anemia, and obesity/BMI of 38%. (Tr 236).

On February 10, 2006, Dr. Cox noted that Plaintiff had been seen in the clinic for 8 or 9 months and that she had "significant depression with anxiety, probably some ingrained dysthymia disorder." Dr. Cox's treatment plan was to continue Zoloft, Xanax, and Ambien. Dr. Cox also advised Plaintiff to keep her appointment with her counselor. (Tr 221-222).

On February 13, 2006, Dr. Nazareno reevaluated Plaintiff and assessed hypertension, anemia, depression, and obesity. (Tr. 235).

On February 18, 2006, Plaintiff's therapist at Affiliated Counseling and Psychotherapy Center noted that Plaintiff had constricted affect, and anxious and depressed mood. (Tr 242).

On April 7, 2006, Dr. Cox reevaluated Plaintiff for continued trouble sleeping. Plaintiff reported that Ambien was not working. Dr. Cox replaced Plaintiff's prescription of Ambien with Trazodone, and continued Zoloft and Xanax. (Tr. 266).

A Psychiatric Review Technique Questionnaire and Mental Residual Functional Capacity Evaluation were completed by Robbie Ronin, a non-examining doctor on contract to the Administration, on April 24, 2006. (Tr 247-260, 261-264). Dr. Ronin indicated that Plaintiff had medically determinable

impairments causing mild restriction of daily activities; moderate difficulty in maintaining social functioning; moderate difficulty in maintaining concentration, persistence, and pace; and, no episodes of decompensation. Dr. Ronin specifically noted that Plaintiff was credible and had severe impairments, but these impairments would not preclude the performance of simple, repetitive, routine tasks in a low stress environment. (Tr 263).

On May 2, 2006, Dr. Nazareno reviewed Plaintiff's multiple medical conditions, including herpetic tongue lesion, anemia and B12 deficiency, hypertension, dyslipidemia, and obesity. It was noted that Plaintiff's BMI was down to 36%. (Tr. 270).

On May 5, 2006, Dr. Cox noted that Plaintiff's mood and affect were "distant" and she did not want to continue with separate sleep medication. (Tr. 265). On June 30, 2006, Plaintiff reported being under a lot of stress. Dr. Cox indicated that Plaintiff was having "sleepless nights and difficultly during the days, most likely situational." Dr. Cox started Ambien. (Tr. 304).

On July 12, 2006, Dr. Nazareno treated Plaintiff for hypertension and B12 deficiency. Her medications were adjusted. Dr. Nazareno also diagnosed Plaintiff with morbid obesity, noting that her BMI was 38%. (Tr. 357).

A Psychiatric Review Technique Questionnaire and Mental Residual Functional Capacity Evaluation were completed by Debra Price, a non-examining doctor on contract to the Administration, on July 14, 20066. (Tr. 272-285, 286-289). Dr. Price's opinion was essentially the same as Dr. Ronin's opinion.

On July 26, 2006, Plaintiff had a psychiatric evaluation with Delfin Valite, M.D. another staff psychiatrist at Affiliated Counseling and Psychotherapy Centers. Dr. Valite noted that Plaintiff had been a "patient of the clinic for some time." Plaintiff was having continued trouble sleeping and "often isolates at home." She complained of poor motivation, decreased motivation in activities, and isolated

5

behaviors. Dr. Valite's mental status examination revealed that Plaintiff was passively cooperative and minimally interactive. Plaintiff had prominent psychomotor retardation. Her mood was depressed and her affect was flat. Dr. Valite's diagnosis was major depression, recurrent, moderate, generalized anxiety disorder, obesity, hypertension, and a GAF of 60. Plaintiff's prescription for Zoloft was increased and she was started on a trial of Lunesta. (Tr. 302-303).

On August 23, 2006, Dr. Valite reevaluated Plaintiff, who reported that she was not doing well and her depression had increased. Dr. Valite noted that Plaintiff had poor eye contact, slow cadence in her speech, goal directed thoughts, depressed mood, and flat affect. Dr. Valite adjusted Plaintiff's medications and advised Plaintiff to return to see her therapist. (Tr. 301).

On September 12, 2006, Dr. Nazareno saw Plaintiff for hypertension, dyslipidemia, recurrent headache, and B12 deficiency. Dr. Nazareno added Topamax for headaches. (Tr. 356).

On September 20, 2006, Dr. Valite reevaluated Plaintiff for increased anxiety and personal relationship stressors. Her mood continued to be depressed and her affect continued to be flat. Dr. Valite advised Plaintiff to continue her current level of Zoloft, and increase her Xanax and Lunesta. (Tr. 300).

On October 5, 2006 and October 13, 2006, Dr. Nazareno followed Plaintiff for her multiple medical problems, including hypertension, urinary tract infection, and recurrent migraine headaches. (Tr. 354-355).

On October 18, 2006, Dr. Valite noted that Plaintiff remained "quite depressed." She was minimally interactive and presented with a "very flat affect." Dr. Valite also stated that Plaintiff had thought blocking and some difficulty organizing her thoughts. Dr. Valite's diagnosis continued to be major depressive disorder, recurrent, severe, without psychotic features, and generalized anxiety disorder. Medications were continued. (Tr. 299). On this same date, Dr. Valite completed a Mental Residual Functional Capacity Assessment which contained work preclusive limitations. (Tr. 294-296).

6

Dr. Valite indicated that Kirby had the following "marked" limitations: 1) the ability to remember locations and work-like procedures, 2) the ability to understand and remember detailed instructions, 3) the ability to carry out detailed instructions, 4) the ability to maintain attention and concentration for extended periods, 5) the ability to work in coordination or proximity to others without being distracted by them, 6) the ability to perform at a consistent pace without an unreasonable number and length of rest periods, 7) the ability to accept instructions and respond appropriately to criticism from supervisors, 8) the ability to be aware to normal hazards and take appropriate precautions, 9) the ability to travel to unfamiliar places or to use public transportation, and 10) the ability to set realistic goals or make plans independently of others. All other limitations were marked as "moderate." (Tr. 294-296).

Brooke Guthrie, LMSW, of Affiliated Counseling and Psychotherapy Centers, completed a Mental Residual Functional Capacity Assessment regarding Plaintiff. This assessment is not dated, but has a "received" stamp dated November 6, 2006. Ms. Guthrie noted that Plaintiff had numerous "marked" limitations, including the ability to: 1)remember locations and work-like procedures, 2) understand and remember detailed instructions, 3) carry out detailed instructions, 4) maintain attention and concentration for extended periods, 5) work in coordination with or proximity to others without being distracted by them, 6) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at consistent pace without an unreasonable number and length of rest periods, 7) interact appropriately with general public, 8) ask simple questions or request assistance, 9) accept instructions and respond appropriately to criticism from supervisors, 10) get along with coworkers or peers without distracting them or exhibiting behavioral extremes, 11) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, 12) respond appropriately to changes in the work setting, 13) travel in unfamiliar places or use public transportation, and 14) set realistic goals or make plans independently of others. (Tr. 359-360). All other limitations

7

were checked as moderate. Ms. Guthrie's summary was as follows:

> Angela Kirby suffers from severe and recurrent depression as well as anxiety. These conditions have severely and chronically impaired her ability to function in a work and social environment. Ms. Kirby is unable to appropriately read and interrupt social cues and has difficulty motivating herself to complete basic tasks due to her depression and anxiety. (Tr. 361).

On January 8, 2007, Dr. Valite saw Plaintiff in follow-up. Dr. Valite noted that Plaintiff had been doing "well," but continued with persistent insomnia. Dr. Valite's impression was unchanged, and Plaintiff's medications were continued. (Tr. 297-298).

On January 10, 2007, Plaintiff was admitted to the hospital for a suicide attempt. She had taken an overdose of her prescription medications in response to being physically and verbally abused. She remained in the hospital until January 12, 2007, when she was discharged in stable condition. Her final diagnosis was 1) suicide attempt –drug overdose, 2) chronic depression with anxiety, 3) hypertension, and 4) glaucoma. (Tr. 317-344).

On January 15, 2007, Dr. Nazareno saw Plaintiff in follow-up from her recent hospital visit. (Tr. 353). On this same date, Dr. Nazareno completed a questionnaire regarding Plaintiff. Dr. Nazareno stated that Plaintiff could not engage in even sedentary work on an 8 hour day, 5 day per week basis. Additionally, Dr. Nazareno indicated that Plaintiff would not be able to handle any job on an 8 hour day, 5 day per week basis, that required the ability to understand, remember, or carry out anything more than simple instructions, or required anything more than basic one to two step processes. Dr. Nazareno indicated that Plaintiff had 1) a substantial lack of ability to understand, remember, and carry out simple instructions; 2) a substantial lack of ability to respond appropriately to supervision, co-workers, and usual work situations; and, 3) a substantial lack of ability to deal with changes in a routine work setting. Dr. Nazareno also stated that if Plaintiff attempted to work an 8 hour day, 5 days per week basis, she would likely miss more than 3 days per month, and would likely have problems with attention and

8

concentration sufficient to frequently interrupt tasks during the working portion of the day. The impressions that underlie these impairments were major depression and anxiety disorder. Lastly, Dr. Nazareno indicated that the basis for the opinion that Plaintiff suffers at the levels indicated was "Patient recently admitted for suicide attempt/continuing to be depressed even when on counseling and medication." (Tr. 305-306).

On January 20, 2007, Plaintiff went to the emergency department for complaints of suicidal ideation. Plaintiff was noted to have inappropriate behavior and appeared tearful, depressed, and to have ineffective coping. She was stabilized and advised that she was going to be discharged. Plaintiff left the hospital before receiving her discharge instructions. (Tr. 307-316).

On February 5, 2007, Dr. Nazareno evaluated Plaintiff in hospital follow-up. Part of Dr. Nazareno's impression was tendonitis, multiple aches and pains. She was advised to take Naprosyn as needed, but not regularly due to her gastroesphageal reflux problems. She was also advised to try Tylenol 650 mg. for most of her aches and pains (Tr. 352). On April 3, 2007, Dr. Nazareno noted that Plaintiff had swelling in her feet and fluid retention. Dr. Nazareno reviewed Plaintiff's medications, ordered testing, advised Plaintiff on diet and exercise, and instructed her to continue therapy and counseling for her depression and anxiety. (Tr. 372).

On May 9, 2007, Plaintiff returned to Dr. Nazareno with continued complaints of shoulder pain, bilateral feet and ankle swelling, and fatigue. Dr. Nazareno assessment was right shoulder pain, hypertension, fluid retention, fatigue, obesity, and gastroesphageal reflux. (Tr. 370).

On May 17, 2007, Plaintiff had an evaluation with Andrew Harakas, M.D. for a six-month history of right shoulder pain. Following physical examination, Dr. Harakas' diagnosis was right shoulder impingement syndrome, right acromioclavicular joint disease, and enlargement of acromioclavicular joint from some arthopathy. (Tr. 427).

9

On May 18, 2007, Plaintiff had a right shoulder MRI which showed 1) early arthropathy of the acromoclavicular joint, 2) subtle subacromial-subdeltoid bursitis, 3) subtle fraying of the bursal surface of the musculotendinous portion of the supraspinatus muscle without discrete rotator cuff tears apparent, and, 4) downward sloping of the lateral aspect of the acromion compatible causing narrowing of the subacromial space. (Tr. 425).

On July 9, 2007, Dr. Nazareno noted that Plaintiff had stable hypertension, fatigue with history of anemia, right shoulder impingement syndrome, and chronic depression and anxiety. (Tr. 368-369). On July 18, 2007, Dr. Nazareno saw Plaintiff for preoperative clearance for arthroscopic surgery of her shoulder. Dr. Nazareno also evaluated Plaintiff's dermatitis and chronic anxiety disorder with depression. (Tr. 366-367).

On July 24, 2007, Plaintiff underwent 1) arthroscopic debridement of her right shoulder for impingement syndrome; 2) decompression of the subacromial space, partial Mumford procedure of the acromioclavicular joint removing partially of the acromioclavicular joint and the spurs in that area; and, 3) extensive debridement in the shoulder area removing the subacromial bursal tissue, calcified loose bodies, bone spurs, and partially the coracoacromial ligament. (Tr. 448-457).

On September 20, 2007, Dr. Nazareno reevaluated Plaintiff. Her assessments were hypertension, dyslipidemia, low back pain, amenorrhea, morbid obesity, and chronic depression. Dr. Nazareno reviewed Plaintiff's medications and instructed Plaintiff on weight loss and diet, noting that her BMI had increased to 41%. (Tr. 364).

On January 3, 2008, Dr. Harakas evaluated Plaintiff for right shoulder pain. Plaintiff indicated that she had crashed on a 4-wheeler several weeks prior and was feeling pain in a new area of her shoulder. Dr. Harakas' impression was right shoulder contusion, possible hairline crack, and paresthesias into her right hand. Dr. Harakas noted that the prior shoulder surgical cite was doing well. Plaintiff was

10

put back on anti-inflammatory medication and advised to return in two weeks for further evaluation. (Tr. 422).

On February 25, 2008, Bonnie Shannon, the clinical director of Cherokee County Commission of Drug and Alcohol Abuse, provided a letter verifying Plaintiff's attendance in their program and completion of the treatment plan on January 31, 2008. (Tr. 429).

Plaintiff had a clinical psychological evaluation on May 20, 2008 with John Burton, EdD, of Orin Community Health Center. Plaintiff lost custody of her son in January 2008, after her boyfriend was arrested on drug charges and she tested positive for cocaine, marijuana, and opiates, prompting this evaluation. A long history of domestic violence was noted between Plaintiff and her boyfriend. Plaintiff reported experiencing significant symptoms of depression and social anxiety. Dr. Burton noted the possibility of not keeping recent counseling appointments. He indicated that he did not feel Plaintiff was credible because she presented as a person in search of pity and playing the role of a victim. Dr. Burton administered testing which he indicated was valid, with reservations, since several subtests were elevated to a significant level. Dr. Burton recommended that Plaintiff complete a parenting class and substance abuse class. Plaintiff was also advised to continue attending individual counseling on a regular basis, as well as attend counseling sessions with her son to work on applying parenting skills. Dr. Burton indicated that he had great concern about Plaintiff's ability to become a fit parent due to her being unreliable, untrustworthy, and unlikely to develop the sort of life skills and judgment needed. Dr. Burton's diagnoses were poly-substance abuse, rule out dependence, rule out post-traumatic stress syndrome, rule out depressive disorder, rule out borderline personality, and GAF score of 49. (Tr. 431-435).

On June 5, 2008, Plaintiff underwent a hair analysis drug test, the results of which were negative (Tr. 436).

On September 4, 2008, Martha Skelton-Patrick, LISW-CP provided a narrative letter indicating that Plaintiff had been attending counseling sessions with her since July 2007. Plaintiff's primary diagnoses are anxiety disorder with depression and post-traumatic stress disorder –chronic with panic attacks. Ms. Skelton-Patrick indicated that Plaintiff is presently "unable to cope with daily life and often has depressive episodes of in which she spends days at home crying." She also stated that Plaintiff "cannot work in public as she has frequent panic attacks and will leave public places to return home, e.g. before her shopping or errands are completed." Ms. Skelton-Patrick feels that Plaintiff is "emotionally disabled and remains unemployable until she can cope with her problems." She also said Plaintiff made slow progress in her recovery and development of coping skills, and will only be able to consider employment after further behavioral therapy. (Tr. 474).

On August 10, 2009, Heather Esquivel, M.D., of ReGenesis Community Health, initially evaluated Plaintiff as a new patient. Dr. Esquivel elicited a detailed history and performed a physical examination. Plaintiff was 5'2" and weighed 181 lbs., making her BMI 33. Dr. Esquivel's diagnoses were essential hypertension, gastroesophageal reflux, depressive disorder, and generalized anxiety disorder. Plaintiff was given prescriptions for Darvocet, Neurontin, Klonopin, K-Dur, Lasix, Ziac, and Zoloft. (Tr. 483-485).

On September 11, 2009, Plaintiff was treated in the emergency room for back pain. She was diagnosed with an acute traumatic lumbar sprain and prescribed Flexeril and Naprosyn. (Tr. 739-741).

On October 6, 2009, Dr. Esquivel evaluated Plaintiff for her depression, anxiety, hypertension, GERD, and possible neuropathy of her lower extremities. Plaintiff's medications were reviewed and refilled. Dr. Esquivel's diagnosis was unspecified idiopathic neuropathy, esophageal reflux, generalized anxiety disorder, depressive disorder, and unspecified essential hypertension. (Tr. 489-491).

On October 13, 2009, December 22, 2009, and February 24, 2010, Sharon Wright, a behavior

health counselor through ReGenesis evaluated Plaintiff. Ms. Wright noted that Plaintiff had psychomotor retardation, constricted affect, constricted mood, illogical thought patterns, and poor judgment. Plaintiff's diagnoses were 1) major depression, recurrent, moderate, 2) generalized anxiety disorder, and, 3) panic disorder with agoraphobia. (Tr. 503-505).

On December 3, 2009, Dr. Esquivel evaluated Plaintiff for complaints of anxiety, depression and leg pain. Plaintiff noted that the Neurontin was helping the tingling in her legs, but she was "still needing" Darvocet daily. It was noted that the original Darvocet prescription was given for back pain, which she was no longer experiencing. Plaintiff also noted some shoulder pain at this visit. Medications were reviewed and adjusted. (Tr. 492-495).

On January 12, 2010, Plaintiff was treated in the emergency room following a motor vehicle accident. She complained of right anterior shoulder pain. She was diagnosed with a shoulder contusion and advised to follow-up with Dr. Esquivel. (Tr. 734-735).

On February 10, 2010, Dr. Esquivel noted that Klonopin was not keeping Plaintiff's anxiety under control. Additionally, Plaintiff complained of hurting her right shoulder in a motor vehicle accident several weeks prior. (Tr. 496-499). On February 24, 2010, Plaintiff reported that her shoulder pain was improved. Dr. Esquivel diagnosed localized osteoarthrosis involving the shoulder region. She advised continued NSAIDS and range of motion exercises. (Tr. 500-502).

On February 25, 2010, Dr. Esquivel provided a letter report regarding Plaintiff's medical diagnosis, as they relate to her ability to work. Dr. Esquivel stated,

> After careful review of her prior medical records and symptoms she has experienced over the last 6-7 months, she has been determined to have chronic pain from both arthritis of multiple areas and peripheral neuropathy in her feet. She also has a long history of depression and anxiety. All issues are currently under evaluation and treatment. It is my understanding that the combined effects of these chronic issues had made it difficult to for Ms. Kirby to maintain gainful employment. Given the fact that these medical problems cause a variety of symptoms that are unpredictable in their frequency and intensity, I doubt she would be able to maintain employment for any significant period of time now or in the future.

(Tr. 508).

On March 15, 2010, Dr. Valite wrote a letter report regarding Plaintiff which contained work preclusive limitations. (Tr. 506). He stated that he last evaluated Plaintiff on January 8, 2007, and at that time she presented with excessive worrying and restlessness, exhibited poor concentration, reported difficulty sleeping, spoke in monotone, and presented with prominent psychomotor retardation. In addition, Plaintiff had a depressed mood and flat affect. Dr. Valite noted that the GAF score he recorded on that date was incorrectly marked and should have been 40. Dr. Valite prescribed the maximum dose of Zoloft, as well as Klonopin for anxiety, and Ambien for insomnia. Plaintiff exhibited a slight improvement in symptoms, but continued missing appointments, which Dr. Valite stated is "a behavior consistent with major depression." Dr. Valite also offered the following opinion:

> Based upon my observation of Ms. Kirby, she would not be able to attend work regularly during the time period that I treated her. It was consistent with her condition that she would have missed more than 3 days of work per month. She presented with significant difficulty concentrating and she had a hard time answering my questions. Based on this observation, she would have experienced interruptions to her concentration sufficient to frequently interrupt tasks. Her tendency to isolate herself socially would have prevented her from being able to interact appropriately with coworkers and supervisors. It is my understanding that she had been suffering from her severe depressive symptoms for some time prior to the time I saw her. When I first saw her she was already taking Zoloft, and I had to increase her dosage because her symptoms were not adequately controlled.

(Tr. 506).

On April 14, 2010, Dr. Esquivel evaluated Plaintiff for follow-up of her "multiple chronic conditions." Plaintiff reported that she had recently lost her insurance and indicated needing a "cheaper alternate to Neurontin for neuropathy." Plaintiff reported a return of her shoulder pain and indicated that Ibuprofen was "not helping much." Dr. Esquivel noted that Plaintiff's child had been removed from her home after positive cocaine results. Dr. Esquivel reviewed and continued Plaintiff's medications. After admitting to taking a friend's Lortab for pain, Dr. Esquivel informed Plaintiff that they would not be able to prescribe benzodiazepines if she continues to take controlled substances that were not prescribed to

her. Dr. Esquivel also advised continued follow-up with other treatment including seeing a counselor for psychiatric problems. (Tr. 700-703).

On November 20, 2010, Plaintiff was treated in the emergency room after running out of her medications and being unable to afford to see her primary care physician. (Tr. 732-733).

Plaintiff was treated in the hospital on December 11, 2010 for depression and suicidal ideation after an attempted overdose. (Tr. 725-731).

On March 30, 2011, Dr. Esquivel evaluated Plaintiff for shoulder pain, neuropathy, and depression. Plaintiff reported that she had lost her insurance and that was the reason had been unable to follow-up with treatment. Plaintiff requested being out of medications for several months and wanted to restart her medications. Dr. Esquivel diagnosed osteoarthrosis, localized, not specified whether primary or secondary, involving shoulder region; hyperlipidemia; unspecified essential hypertension; depressive disorder, not elsewhere classified; generalized anxiety disorder; esophageal reflux; and, unspecified idiopathic peripheral neuropathy. Dr. Esquivel restarted Plaintiff's medications including Klonopin, Zoloft, NSAIDS, and Neurontin. (Tr. 711-713).

On November 22, 2011, Plaintiff was treated in the emergency room for left ankle pain. She was diagnosed with a ligamentous left ankle sprain. (Tr. 721-724).

On January 1, 2012, Dr. Esquivel evaluated Plaintiff after not being seen for almost a year. Plaintiff reported that she had been incarcerated from May to October 2011 but did continue to receive treatment while incarcerated. Plaintiff also reported seeing mental health. Dr. Esquivel indicated that Plaintiff was appropriately oriented, had a depressed mood and affect appropriate to her situation. Plaintiff was prescribed Lasix for lower extremity edema, Klonopin and Zoloft for depression and anxiety, NSAIDS for osteoarthritis pain, and Neurontin for peripheral neuropathy. (Tr. 708-710). On May 10, 2012, Dr. Esquivel reevaluated Plaintiff for multiple problems. It was noted that Plaintiff was

15

being treated through mental health but they could not prescribed Klonopin since she was a new patient. (Tr. 705-707).

Plaintiff was hospitalized from June 16, 2012 to June 19, 2012 for depression with suicidal ideation after trying to overdose on her prescription medications. (Tr. 715-720). She was transferred to a treatment facility and remained there until June 27, 2012. On admission, Plaintiff endorsed symptoms of poor attention to activities of daily living, low energy, positive anhedonia, social isolation, increased irritability and lability, frequent crying spells, poor sleep, increased anxiety, panic attacks, social anxiety, and PTSD. Plaintiff affect was sad and flat. Her speech was regular with normal volume. Her thought content was paranoid and delusional but without hallucinations. Her thought content had suicidal or homicidal ideation and her thought process was disorganized and concrete. Plaintiff's judgment and insight were poor and her memory was intact. She was diagnosed with major depressive ideation and a GAF score of 30. Her GAF was 60 upon discharge. (Tr. 744-747, 759-767).

Plaintiff was hospitalized from July 10-13, 2012 for depression and suicidal ideation following an overdose attempt. (Tr. 769-801).

On August 1, 2012, Kirsten Nielson, Ph.D., performed an initial clinical assessment of Plaintiff. Dr. Nielson elicited a detailed history and performed a mental status examination. Plaintiff was mood was depressed and her affect was flat. Her intelligence was estimated to be below average. Plaintiff was diagnosed with major depressive disorder, recurrent, moderate; panic disorder without agoraphobia; opioid dependence in remission; multiple physical impairments; and, a current GAF score of 47. (Tr. 803-811). A treatment plan was set which included a psychiatric evaluation and individual and group therapy. (Tr. 812-815).

On September 27, 2012, Dr. Valite performed a psychiatric evaluation of Plaintiff at the request of her attorney. (Tr. 817-821). Plaintiff reported that her problems began when her husband died in 2004.

16

She reported chronic and daily episodes of depression. Plaintiff's symptoms included feelings of sadness, less energy, sleep troubles, lack of participation in housework or activities, difficulty concentrating and memory problems, fatigue, irritability, and outbursts of anger. Dr. Valite indicated that Plaintiff also described generalized anxiety and worry which had been present for years. Dr. Valite also indicated that Plaintiff had symptoms of social anxiety disorder. Dr. Valite elicited a detailed history including information about Plaintiff's dysfunctional childhood and sexual abuse by her older brother and her current situation of being homeless and staying at a shelter. Dr. Valite found that Plaintiff presented as "glum" and "downcast." She looked unhappy and her speech was monotonal, slow, and soft. Her demeanor was sad and her body posture and altitude conveyed an underlying depressed mood. Her affect was flat. She had no signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process. Plaintiff described suicidal ideas but intentions were convincingly denied. Plaintiff's immediate memory recall was good. She could not perform serial 7's. She was able to spell a 4 letter word backwards but made mistakes on a 5 letter word. Her insight was normal. Dr. Valite noted signs of anxiety but no signs of hyperactive or attentional difficulties. Dr. Valite diagnosed major depressive disorder, single, severe without psychotic features; generalized anxiety disorder; social phobia; and, a current GAF score of 45. Dr. Valite recommended that Plaintiff be weaned off of Zoloft since she had been on it for multiple years with minimal improvement and that her dose of Cymbalta be slowly titrated up. Dr. Valite indicated that Plaintiff needed "continued close monitoring by a mental health professional." He stated, "With her chronic mental illness and poor response to medications, I don't think she is capable of sustaining any type of work of any kind." (Tr. 820).

## C.     The Administrative Proceedings

## 1.     The Administrative Hearing

### a.     Vocational Evidence

17

At the hearing on September 25, 2012, Karl S. Rock Weldon, a vocational expert, testified. (Tr. 608-613). The VE testified that Plaintiff had past relevant work as a personal care assistant. (Tr. 609). The ALJ asked the VE if there would be any past work or other work available for the following hypothetical person:

> I'd like you to consider someone of Ms. Kirby's age, education, and experience who is limited to a maximum of medium work. And that's lifting 50 pounds occasionally, 25 pounds frequently. Sit, stand, or walk up to six hours each in an eight-hour day. But is limited to no more than simple, repetitive tasks and instructions and jobs that really have --well, jobs that are low-pace, no -you know, low production pace, low stress, minimal contact with the public, and --okay. I'll go with that. And minimal contact with the public. Would there be --oh, and no high production pace jobs, certainly. Would there be work available for such an individual?

> (Tr. 609).

The VE responded that this hypothetical would allow jobs such a housekeeper or a warehouse worker. (Tr. 610). The ALJ's second hypothetical asked about the limitation to light rather than medium and the VE responded that there would be jobs available such as a hand packager and inspecting jobs. (Tr. 611). Next, the ALJ asked:

> And if this individual, as a result of chronic pain and symptoms of depression, was unable to consistently work eight hours a day, five days a week, or would miss three or more days of work per month, would these jobs or any others be available?

> (Tr. 611).

The VE responded that there would be no gainful work activity with those limitations. The VE also responded that there would be no work if the individual "could not maintain attention and focus on a task for as much as two hours at a time." (Tr. 611). In response to questions from Plaintiff's attorney, the VE testified that a restriction of no exposure to sharp objects and only frequent overhead reaching with her dominant right arm would not restrict the identified jobs. (Tr. 612-613).

18

**2.**     **The ALJ's Decision**

In the decision of April 3, 2013, the ALJ found  the following:

1.     The claimant meets the insured status requirements of the Social Security Act through March 30, 2008.

2.     The claimant has not engaged in substantial gainful activity since September 1, 2004, the alleged onset date  (20 CFR 404.1571, *et seq*. and 416.971 *et seq*.).

3.     The claimant has the following severe impairments: right shoulder degenerative joint disease, peripheral neuropathy, obesity, depression, anxiety disorder, and personality disorder. (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that met or  medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526, 416.920(d), 416.925 and 416.926)).

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium (lift, carry, push, or pull 50 pounds occasionally and 25 pounds frequently; stand or walk 6 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday), as defined in 20 CFR 404.1567(b) and 416.967(b) except that she is limited to the performance of simple, repetitive, and routine tasks with correspondingly simple instructions. These jobs must further have a low production pace, be low stress, and provide minimal contact with the public. Claimant cannot perform fast paced jobs with high production demands.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on September 28, 1969 and was 34 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964)

19

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2004, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 529-546).

## II. DISCUSSION

The Plaintiff argues that the ALJ erred in her decision, and that reversal and remand are appropriate in this case. Specifically, Plaintiff raises the following issue in her brief, quoted verbatim:

I.    Evaluating the opinion evidence. Treating physicians' opinions are entitled to great weight in the absence of compelling contrary evidence and may be entitled to controlling weight. The ALJ improperly gave little weight to a substantial number of treating and examining medical opinions which supported a finding of disability. Where the ALJ improperly disregards or weighs the opinion evidence, can his decision be supported by substantial evidence?

(Plaintiff's brief).

The Commissioner argues that the ALJ's RFC finding was based on substantial evidence, that the ALJ properly weighed Dr. Valite's opinions, and that the ALJ properly considered the remaining documents upon which Plaintiff relies.

## A.        LEGAL FRAMEWORK

### 1.    The Commissioner's Determination–of–Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months. 42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. See, e.g., Heckler v. Campbell, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from

---

[3]The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990); see Bowen v. Yuckert, 482 U.S. 137, 146, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

performing PRW;[4]  and (5) whether the impairment prevents him from doing SGA. See 20 C.F.R.

§ 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's

disability analysis. If a decision regarding disability may be made at any step, no further inquiry is

necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled

or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is

customarily performed in the economy or as the claimant actually performed the work. See 20 C.F.R.

Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the

burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d) (5).

Once an individual has made a prima facie showing of disability by establishing the inability

to return to PRW, the burden shifts to the Commissioner to come forward with evidence that

claimant can perform alternative work and that such work exists in the regional economy. To satisfy

that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs

available in the national economy that claimant can perform despite the existence of impairments

that prevent the return to PRW. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir.2002). If the

Commissioner satisfies that burden, the claimant must then establish that he is unable to perform

other work. Hall v. Harris, 658 F.2d 260, 264–65 (4th Cir.1981); see generally Bowen v. Yuckert,

482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (regarding burdens of proof).

## 2.    The Court's Standard of Review

---

[4]In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. See id.; Richardson v. Perales, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Walls, 296 F.3d at 290 (citing Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." Vitek v. Finch, 438 F.2d 1157, 1157–58 (4th Cir.1971); see Pyles v. Bowen, 849 F.2d 846, 848 (4th Cir.1988) (citing Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 390, 401; Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir.2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. See Vitek, 438 F.2d at 1157–58; see also Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir.1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir.1972).

**B.    ANALYSIS**

The primary issue raised by Plaintiff is the ALJ's evaluation of the opinion evidence of treating psychiatrist Dr. Valite.   The Social Security Administration's regulations provide

that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. §
404.1527(c). Generally, more weight is given to the opinions of examining physicians than
nonexamining physicians. More weight is given to the opinions of treating physicians since they are
more likely to be able to provide a detailed, longitudinal picture of a claimant's medical impairment.
See 20 C.F.R. §§ 404.1508 and § 404.1527(c)(2). The medical opinion of a treating physician is
entitled to controlling weight, i.e. it must be adopted by the ALJ, if it is well-supported by medically
acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other
substantial evidence in the record. See 20 C.F.R. § 404.1527(c)(2), SSR 96-2p, and Mastro v. Apfel,
270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not
supported by clinical evidence, it should be accorded significantly less weight." Craig v. Chater, 76
F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less
weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro,
270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2 31, 35 (4th Cir. 1992)).

In determining what weight to give the opinions of medical sources, the ALJ must apply all
of the factors in 20 C.F.R. § 404.1527(c)(1)-(6), which are: whether the source examined the
claimant; whether the source has a treatment relationship with the claimant and, if so, the length of
the relationship and the frequency of examination; the nature and extent of the treatment
relationship; the supportability and consistency of the source's opinion with respect to all of the
evidence of record; whether the source is a specialist; and, other relevant factors. See SSR 96-2p;
Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006).

Part of the entire purpose of the District Court remand Order, and the subsequent remand
from the Appeals Council, was for the ALJ to give further consideration to the opinion of treating

24

source Dr. Valite.  The ALJ specifically noted this directive and thoroughly evaluated and explained the weight she was giving to each of Dr. Valite's opinions.  The ALJ's discussion of her evaluation of Dr. Valite's opinions reads as follows:

> Similarly, I give great weight to Dr. Valite's opinions as set forth in his contemporaneous, narrative, records.  For example, in January 2007, Dr. Valite noted that claimant had recurrent moderate depression and generalized anxiety disorder, with depressed mood and flat affect.  (Exhibit 16F). I give little weight to Dr. Valite's check off mental residual functional capacity form dated October 18, 2006 (Exhibit 15F).  While that assessment is somewhat consistent with Dr. Valite's treatment notes of the same date (Exhibit 16F/3), it is far more restrictive than appears necessary based on the remainder of the treatment notes.
>
> In September 2006 and January 2007, Dr. Valite noted that the claimant was "doing well."[5] He routinely assessed her GAF as 60. January 2007 mental exam was normal (alert; fairly-groomed and cooperative; no psycho-motor abnormality; speech was normal in cadence and was mostly clear and coherent, with goal-oriented thoughts; denied any auditory hallucinations or any acute suicidal or homicidal thoughts; had good impulse control, fair insight and judgment; was alert and oriented to all spheres; no memory deficits elicited; and had good abstraction and concentration), except for the following minor findings: mood was depressed; her affect was flat; and appeared to be of below-average intelligence based on her vocabulary use (Ex.16F). Dr. Valite's treatment notes show that she came every 4 weeks as instructed (missing only 1 appointment), was mostly compliant with her therapy appointments, and was compliant with her medications without significant side effects (and got good  sleep on Lunesta)(Exhibit 16F).
>
> I give "very little weight to Dr. Valite's March 15, 2010 letter indicating that claimant was in fact more depressed than his records reflect (Exhibit 33F), choosing instead to place greater weight on the contemporaneous assessments.
>
> Finally, I turn to Delfin Valite's, M.D., September 2012 attorney referred "updated" psychiatric evaluation (Ex. 42F).  Dr. Valite was not treating the claimant at the time of this September 2012 opinion, and his basis for this updated opinion was a 60-minute interview.  The claimant received no specialized mental healthcare in 2009 and 2010, and 2011 Cherokee Mental Health[6] notes show intact cognition and only moderately limiting mental symptoms

---

[5]The Plaintiff argues that the phrase "doing well" does not equate with an ability to work. The Court does not conclude based on the Decision as a whole that the ALJ considered the comment to have such great meaning.  Furthermore, the ALJ appropriately considered the comment that Plaintiff was doing well in the context of the record as a whole.

[6]Plaintiff correctly notes that the ALJ refers to evidence from her subsequent application for benefits and that said evidence is not part of the record before this Court (Pl's Mem. 30, referring to Tr. 542-43). Plaintiff does not cite any authority concerning the legal significance of

(sub app Exs. 31F, 35F). An August 2012 mental exam was normal, except for depressed mood, flat affect, loss of interests, and below average intelligence estimate. August 2012 mental health treatment notes show that the claimant's interests/abilities were reading mystery novels, going to the library, walking, swimming, enjoyed eating out (Ex 41F).

Also, I note Dr. Valites's evaluation was only 2 days after the claimant's September 25, 2012 hearing, where she did present with a flat affect, but she provided detailed, responsive answers to questions using appropriate medical terms. Her speech was spontaneous and logical with good grammar and vocabulary. The claimant's behavior at this hearing contrasts with Dr. Valite's mental exam which noted more depressed and anxious behaviors; however, with no evidence of psychosis, lack of reality contact, hallucinations, delusions, or paranoia. Additionally, Dr. Valite noted that her associations were intact, thinking was logical; thought content was appropriate; suicidal ideas were described by intentions were convincingly denied; immediate memory recall was good; insight into problems was normal; and there were no signs of hyperactive or attentional difficulties. This evidence is not consistent Dr. Valite's opinion that, "I don't think she is capable of sustaining any type work of any kind" (Ex 42F), as issue reserved to the Commissioner. Simply put, I find nothing in this opinion from Dr. Valite which leads me to conclude that the limitations he assesses were present during the period at issue.

(Tr. 542-543).

Plaintiff correctly observes that the ALJ misquoted one word in one of Dr. Valite's treatment

notes specifically, that the ALJ indicated that in January 2007, Dr. Valite noted that claimant had

---

these references. Assuming for the sake of argument that the ALJ erred by referring to this evidence without formally incorporating it into the administrative record in this case, however, Plaintiff fails to establishing any prejudice from such an error. See Shinseki v. Sanders, 556 U.S. 396, 409 (2009) ("the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); Camp v. Massanari, No. 01-1924, 2001 WL 1658913 at **1 (4th Cir. Dec. 27, 2001) ("any error on the part of the ALJ was harmless" because plaintiff "made no showing of prejudice"). Plaintiff had access to this evidence (Tr. 540 n.3) and appears to admit that the ALJ accurately characterized the substance of this evidence. Furthermore, as indicated herein, there is substantial evidence to support the ALJ's Decision, even in the absence of the evidence from the subsequent application. See, e.g., Hosey v. Astrue, No. 2:11-cv-42, 2012 WL 667813, at *7 (Mag. J.) (N.D. W.Va. Feb. 6, 2012) (error in adjudicator's analysis harmless because denial of benefits was supported by other factors), adopted, 2012 WL 665098 (N.D. W. Va. Feb. 28, 2012). Finally, although Plaintiff is correct that the ALJ refers to a report that Hugh Clarke, M.D., prepared in connection with the subsequent application (Pl's Mem. 30, referring to Tr. 542), as the Commissioner's suggests, this reference is irrelevant because it is limited exclusively to the ALJ's finding concerning Plaintiff's *physical* limitations (Tr. 542) and Plaintiff does not challenge that finding before this Court.

recurrent "moderate" depression, when the treatment notes actually read "severe" depression. (Tr. 298) Dr. Valite's treatment notes from July 2006 (Tr. 303), August 2006 (Tr. 301), and September 2006 (Tr. 300) all indicate that Plaintiff's depression was "moderate." In October and January the notation changes to "Severe. (Tr. 298, 299)  However, although the ALJ misquotes the January treatment record, he does indicate that he has considered the October treatment notes which also indicate severe depression and the check off mental RFC form dated that same day, as well as the remainder of the treatment notes from this physician, and notes that the RFC form completed by Dr. Valite is far more restrictive than the treatment notes would suggest.  The Court finds this misquotation to be akin to a scrivener's error.  To the extent that there is error there has been no showing that it is not harmless. It is clear that the ALJ considered all of the treatment notes from Dr. Valite as a whole for Plaintiff's symptoms and abilities, and not only for the diagnostic delineation of her depression as moderate or severe.  Furthermore, in addition, to Dr. Valite's own records that often characterize Plaintiff's depression as moderate, there is additional evidence in the record from Dr. Ronin and Kirsten Nielsen, Ph.D., LPC that Plaintiff's depression was "moderate." (Tr. 259, 263, and 812).

Plaintiff also suggests that the ALJ has cherry picked the record for references that support his decision while ignoring the references that do not support it. The ALJ cannot just set out parts of an opinion and stop at that. The ALJ is prohibited from cherry picking the evidence, that is, he may consider and discount evidence contrary to his views, or consider it and adopt it, but he cannot simply ignore it and skip over it. The ALJ is obligated to consider all evidence, not just that which is helpful to his decision. Robinson v. Colvin, 2014 WL 4954709 (2014) (citing Gordon v. Schweiker, 725 F.2d 231, (4th Cir. 1984) and Murphy v. Bowen, 810 F.2d 433, 437 (4th Cir. 1987)).

However, this Court has made clear that "an ALJ is not required to provide a written evaluation of every piece of evidence, but need only 'minimally articulate' his reasoning." Jackson v. Astrue, No. 8:08–2855, 2010 WL 500449, at *10 (D.S.C. Jan. 19, 2010) (Mag. J.) (collecting authority from 7th, 8th, 10th and 11th Circuits), adopted by 2010 WL 500449 (Feb. 5, 2010). As this Court also has made clear, "'an ALJ's failure to *cite* specific evidence does not indicate that it was not *considered.*'" *Id.* at *10 (emphasis added). As another Court within the Fourth Circuit has explained, "an ALJ is not tasked with the 'impossible burden of mentioning every piece of evidence' that may be placed into the Administrative Record." Carringer v. Colvin, No. 2:13-cv-00027, 2014 WL 1281122, at *7 (W.D.N.C., March 27, 2014). The Court finds that the ALJ in this case considered the treatment records of Dr. Valite in their entirety, and as indicated by the portions referenced, considered them as a whole. Additionally the ALJ in this case indicates repeatedly that she has considered all of the evidence, and the entire record. The court does not conclude that the ALJ cherry-picked the evidence.

The Plaintiff also argues that the ALJ also made a medical determination of Dr. Valite's mental examination findings, which she was not qualified to interpret when she stated that the January 2007 mental exam was "normal." However, as the remainder of this paragraph in the ALJ's decision includes the findings from the treatment notes as to mental status examination in its entirety, the Court does not find that the ALJ was exercising an expertise that she did not possess, but was summarizing the treatment notes. See Moss v. Astrue, 2008 WL 4332097, 8 -9 (S.D.W.Va. 2008); compare Wilson v. Heckler, 743 F.2d 218 (4th Cir.1984).

With regards to the ALJ's treatment of the substance of Dr. Valite's opinions that Plaintiff's mental impairments are disabling (Tr. 506 (Plaintiff "would not have been able to attend work

regularly during the time period that I treated her"); Tr. 820 ("I don't think [Plaintiff] is capable of

sustaining any type of work of any kind")), the Court finds no error. As the ALJ correctly indicates,

determinations of disability are ultimately "an issue reserved to the Commissioner" (Tr. 543). More

fully, pursuant to SSR 96-5p, available at 1996 WL 374183, at *2, "treating source opinions on

issues that are reserved to the Commissioner are never entitled to . . . special significance. Giving

controlling weight to such opinions . . . would be an abdication of the Commissioner's statutory

responsibility to determine whether an individual is disabled" (emphasis added). That said, opinions

from any medical source on issues reserved to the Commissioner must never be ignored. The

adjudicator is required to evaluate all evidence in the case record that may have a bearing on the

determination or decision of disability, including opinions from medical sources about issues

reserved to the Commissioner. If the case record contains an opinion from a medical source on an

issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record

to determine the extent to which the opinion is supported by the record. Id. at *3. The ALJ in this

case complied with this obligation with respect to Dr. Valite's opinions.

     Dr. Valite expressed one of his opinions by "checking off blocks" on a form (Tr. 539,

referring to Tr. 294-95). Although that form invited Dr. Valite to provide a "Functional Capacity

Assessment" to "[e]xplain [his] summary conclusions in narrative for[m]," Dr. Valite left that

section blank (Tr. 539, referring to Tr. 296). The lack of explanation and support for these summary

opinions is a valid basis to for the ALJ to discount Dr. Valite's opinion. See 20 C.F.R. §§

404.1527(c)(3), 416.927(c)(3) ("The more a medical source presents relevant evidence to support

an opinion . . . the more weight we will give that opinion. The better an explanation a source

provides for an opinion, the more weight we will give that opinion."); see also Hart v. Astrue, 349

F. App'x 175, 178 (9th Cir. 2009) (ALJ properly rejected checklist opinion because it contained no rationale or explanation); Halloran v. Barnhart, 362 F.3d 28, 31 n.2 & 32 (2d Cir. 2004) (checklist opinions are "only marginally useful" and "not particularly informative"); see also, e.g., Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012) (conclusory checkbox form that cites no evidence and provides little to no elaboration "has little evidentiary value"); Berrios Lopez v. Sec'y of Health & Human Servs., 952 F.2d 427, 431 (1st Cir. 1991) (checklist opinions are "entitled to relatively little weight").

Additionally, the ALJ also concluded that Dr. Valite's treatment notes are inconsistent with his opinion that Plaintiff's mental impairments were disabling (Tr. 543). The ALJ is entitled to discount Dr. Valite's opinions on this ground. See, e.g., Davidson v. Astrue, 578 F.3d 838, 843 (8th Cir. 2009) (ALJ entitled to discount opinion of treating physician on ground that it is inconsistent with physician's own treatment notes); Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007) (ALJ properly refused to credit assessment by treating physician because it was inconsistent with physician's own treatment notes); Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159 (11th Cir. 2004) (ALJ properly discredited opinions of two treating physicians because they were inconsistent with physicians' own treatment notes).

The ALJ also notes that Plaintiff "received no specialized mental healthcare in 2009 and 2010" (Tr. 543). As set forth in SSR 96-7p, available at 1996 WL 374186, at *7, an ALJ may properly discount a claimant's allegation that she is disabled where, as here, "the level . . . of treatment is inconsistent with the level of complaints." See also Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994) (Luttig, J., concurring) ("[A]n unexplained inconsistency between the claimant's characterization of the severity of her condition and the treatment she sought to alleviate that

condition is highly probative of the . . . credibility" of complainant's allegation that she is disabled).

In regards to this issue, Plaintiff asserts that "[t]he ALJ failed to properly consider [Plaintiff's]

economic constraints to receiving [specialized mental healthcare] in 2009 and 2010" (Pl's Mem. 30).

In support of this assertion, Plaintiff cites a treatment note from mid April 2010 in which Dr.

Esquivel recited Plaintiff's representation that she had "[r]ecently lost [her] insurance" (Pl's Mem.

30, referring to Tr. 700 (emphasis added)). Assuming the accuracy of this representation, it does not

suggest that Plaintiff was unable to afford specialized mental healthcare at any time in 2009 or in the

beginning of 2010.  Moreover, the document upon which Plaintiff relies indicates that her economic

constraints did not preclude her from obtaining specialized mental healthcare; to the contrary, Dr.

Esquivel specifically reported in her April 2010 treatment note that the plan for Plaintiff's psychiatric

care included following up with a mental health counselor (Tr. 702).

       As to Dr. Valite's September 2012 opinion, the ALJ correctly notes that Dr. Valite was not

treating Plaintiff at the time he provided the opinion, which was based instead upon a single

examination (Tr. 543, referring to Tr. 817-20), which took place only two days after the ALJ

observed Plaintiff at the hearing (Tr. 543, referring to Tr. 584-614 & 817-20). In considering and

discounting the opinion, the ALJ notes her own observations of Plaintiff at the hearing where the

ALJ found that Plaintiff "did present with a flat affect, but she provided detailed, responsive answers

to questions using appropriate medical terms" and "[h]er speech was spontaneous and logical with

good grammar and vocabulary" (Tr. 543, referring to Tr. 590-608). The ALJ was entitled to rely

upon her first-hand observations of Plaintiff's demeanor and presentation. Shively v. Heckler, 739

F.2d 987, 989 (4th Cir. 1984).

       In her argument concerning Dr. Valite's 2012 opinion, Plaintiff quotes Bird v. Comm'r of

31

Soc. Sec., 699 F.3d 337, 345 (4th Cir. 2012), for the proposition that, under certain circumstances, "'an ALJ must give retrospective consideration to medical evidence created after a claimant's last insured date'" (Pl's Mem. 28-29). The ALJ in the instant case complied with this obligation by explicitly considering Dr. Valite's 2012 opinion and explaining why she discounted it (Tr. 543). Additionally, as Plaintiff acknowledges, Dr. Valite does not specifically state in his 2012 evaluation report when Plaintiff's symptoms began, such that the ALJ's conclusion that "I find nothing in this opinion from Dr. Valite which leads me to conclude that the limitations he assesses were present during the period at issue" to be appropriate.

Plaintiff also argues that the ALJ did not properly evaluate the other opinion evidence in the record. This argument is not persuasive. As to the opinions of Brooke Guthrie, LMSW, and Martha Skelton-Patrick, LISW-CP, the ALJ correctly indicates that these individuals are social workers and as such, it follows that these individuals are not "acceptable medical sources" within the meaning of the governing regulations. Accordingly, any documents they generate (Tr. 359-61 & 474) are not "medical opinions." 20 C.F.R. §§ 404.1513(a), 416.913(a); 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The social security regulations distinguish between opinions from "acceptable medical sources" and "other sources." See 20 C.F.R. § 404.1513(d). Social Security Ruling 06–03p further discusses "other sources" as including both "medical sources who are not acceptable medical sources" and "nonmedical sources." Only acceptable medical sources can establish the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose opinions may be entitled to controlling weight. SSR 06–03p. However, medical sources who are not acceptable medical sources may provide opinions reflecting "the source's judgment about some of the same issues addressed in medical opinions from 'acceptable medical sources,' including

symptoms, diagnosis and prognosis, and what the individual can still do despite the impairment(s), and physical or mental restrictions." SSR 06–03p. Social Security Ruling 06–03p further provides:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. In addition, when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision... .

Finally, the ALJs are instructed to apply the factors for evaluating the opinions of acceptable medical sources, which are listed in 20 C.F.R. § 404.1527(c), in evaluating the opinions from other sources with the understanding that not every factor may apply. These factors are the same factors that an ALJ is instructed to apply in evaluating opinions from medical sources and as discussed above include: (1) whether the physician has examined the claimant, (2) the treatment relationship between the physician and the claimant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, (5) whether the physician is a specialist, and (6) other factors that may support or contradict the opinion. See 20 C.F.R. § 404.1527(c).20 C.F.R. §§ 404.1527(a)(2), 404.1527(c)(2), 416.927(a)(2), 416.927(c)(2); see also 20 C.F.R. §§ 404.1513(d) & 416.913(d) ("we may also use evidence from other sources"). Moreover, the Fourth Circuit has emphasized that opinions provided by individuals such as Ms. Guthrie and Ms. Skelton-Patrick are entitled to "significantly less weight" than opinions provided by "acceptable medical sources." Craig, 76 F.3d at 590. The Court finds no error in the ALJ's assessment of the opinions of Brooke Guthrie, LMSW, and Martha Skelton-Patrick, LISW-CP.

As to the opinion of Dr. Cox that Plaintiff would have been unable to function in a work

environment (Tr. 542), the ALJ states that she gave little weight to this opinion because it is inconsistent with Dr. Cox's own contemporaneous treatment records and with the observations of other providers (Tr. 542).

As for the opinions from Dr. Nazareno generated in response to a list of questions from Plaintiff's attorney, the ALJ notes that Dr. Nazareno's opinion "is only minimally supported by [his] treatment records" (Tr. 541). The ALJ also notes that "this opinion was rendered by Dr. Nazareno within days of treating [Plaintiff] for a suicide attempt" in January 2007, and Dr. Nazareno reported shortly thereafter that Plaintiff was "doing well" and that "[h]er stressors have been significantly cut down" (Tr. 539 & 541, referring to Tr. 306, 319, 352, 364).[7]

As to the opinion of Dr. Esquivel, M.D. which concerns an issue that is "reserved to the Commissioner" (Tr. 542), the ALJ appropriately discounted this portion of the opinion as such opinions "are never entitled to . . . special significance." SSR 96-5p, available at 1996 WL 374183, at *3. The ALJ further states that Dr. Esquivel's opinion that she "doubt[s]" that Plaintiff could work "is not consistent with the medical evidence of record" (Tr. 542).

Finally, as to Dr. Burton, the ALJ states that she gave little weight to either of his opinions because they contradict one another (Tr. 541). The governing regulations indicate that the more consistent an opinion is with the reocrd as a whole, the more weight will be given to that opinion. 20 C.F.R. §§ 404.1527(c)(4) & 416.927(c)(4). The ALJ appropriately discounted this opinion based on its inconsistency. Moreover, because Dr. Burton opined that Plaintiff was not credible, reliable,

---

[7]Additionally, responses such as generated here are indistinguishable from checkmarks in boxes labeled "yes" and "no" and generally have little to no probative value. *See, e.g.,* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3); *Hart*, 349 F. App'x at 178; *Halloran*, 362 F.3d at 31 n.2 & 32; *Anderson*, 696 F.3d at 793; *Berrios Lopez*, 952 F.2d at 431; *Frey*, 816 F.2d at 515.

or trustworthy when she alleged that her mental impairments were disabling, Plaintiff cannot sustain her burden of establishing that the ALJ's decision to give little weight to this opinion of Dr. Burton opinion caused her to suffer any prejudice. See Shinseki, 556 U.S. at 409; Camp, 2001 WL 1658913 at **1.

Finally, Plaintiff argues that the ALJ improperly gave too much weight to the opinions provided by the State Agency psychologists because they "never laid eyes" on Plaintiff (Pl's Mem. 34). The Fourth Circuit has stated, however, that "our cases . . . . clearly contemplate" that an adjudicator may reject an opinion – even if it was provided by a treating physician –"in deference to conflicting opinions of non-treating physicians." Campbell v. Bowen, 800 F.2d 1247, 1250 (4th Cir. 1986); see also, SSR 96-6p, 1996 WL 374180, at *3 (opinions of nonexamining state agency physicians "may be entitled to greater weight than the opinions of treating or examining sources"); Diaz v. Shalala, 59 F.3d 307, 313 n. 5 (2d Cir. 1995) (governing regulations permit "the opinions of nonexamining sources to override treating sources' opinions"). After careful review and consideration, the Court finds that the ALJ appropriately considered and evaluated all of the opinion evidence of record and his findings are supported by substantial evidence as outlined herein.

The Court also notes that the appropriate consideration of these opinions as discussed above is also relevant to the Court's conclusion that substantial evidence supports the ALJ's assessment of Plaintiff's RFC. An adjudicator is solely responsible for assessing a claimant's RFC. 20 C.F.R. §§ 404.1546(c), 416.946(c). In making that assessment, she must consider the functional limitations resulting from the claimant's medically determinable impairments. Social Security Ruling ("SSR") 96-8p, available at 1996 WL 374184, at *2. It is the claimant's burden, however, to establish how her impairments impact her functioning. See 20 C.F.R. §§ 404.1512(c), 416.946(c); see also, e.g.,

<u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004) ("[t]he burden of persuasion . . . to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five"); <u>Plummer v. Astrue</u>, No. 5:11-cv-00006, 2011 WL 7938431, at *5 (W.D.N.C. Sept. 26, 2011) (Maj. J. Mem. & Rec.) ("[t]he claimant bears the burden of providing evidence establishing the degree to which her impairments limit her RFC") (citing <u>Stormo</u>), <u>adopted</u>, 2012 WL 1858844 (May 22, 2012), *aff'd*, 487 F. App'x 795 (4th Cir. Nov. 6, 2012).

In this case, the ALJ formulated her RFC finding by giving "great weight" to the opinions provided by the State Agency psychologists (Tr. 541). State Agency psychologist Dr. Ronin reviewed the evidence of record in April 2006 and opined that Plaintiff's mental impairments would not preclude the performance of simple, repetitive, routine tasks ("SRRTs") in a low stress work environment (Tr. 259). Dr. Ronin further opined that Plaintiff was "moderately limited" in her ability to interact appropriately with the general public and that she was "not significantly limited" in her ability to relate appropriately to co-workers and supervisors (Tr. 262). In July 2006, State Agency psychologist Debra Price, Ph.D., reviewed the medical evidence of record and, as Plaintiff acknowledges, provided an opinion that "was essentially the same as Dr. Ronin's opinion" (Pl's Mem. 4, referring to Tr. 272-89). Dr. Price stated in the narrative portion of her opinion that Plaintiff "is able to relate appropriately to co-workers and supervisors but would be best suited for a work setting with limited public contact" (Tr. 288). The ALJ adopted these opinions by finding that Plaintiff retained the RFC to perform SRRTs in "low stress" jobs that involve "minimal contact with the public" (Tr. 536). In addition, the ALJ gave Plaintiff the benefit of the doubt by further limiting her to jobs with simple instructions and a low production pace (<u>Id.</u>); the ALJ reiterated in her RFC finding that Plaintiff "cannot perform fast paced jobs with high production demands" (<u>Id.</u>) .

36

The ALJ properly relied upon these opinions after finding that these opinions are "fully consistent" with the evidence of record as noted below. Tr. 541; see 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). Dr. Cox consistently reported that Plaintiff was alert and oriented. (Tr. 538, referring to Tr. 221, 223, 227, 228, 229, 233, 304). In addition, Dr. Cox consistently reported that Plaintiff denied suicidal or homicidal ideation and that she did not show signs of psychosis (Tr. 221, 223, 227, 228, 229, 233, 304).  Additionally, although Plaintiff allegedly made a suicide attempt in January 2007 (Tr. 319), Dr. Nazareno reported less than one month later that Plaintiff was "doing well" (Tr. 352). Dr. Navarino's contemporaneous treatment notes (Tr. 541) "provide only the briefest notes of depression" prior to Plaintiff's alleged suicide attempt (Tr. 541, referring to, e.g., Tr. 390, 395). Dr. Navarino reported a few months after Plaintiff's alleged suicide attempt that "[h]er stressors have been significantly cut down" (Tr. 539, referring to Tr. 364). Additionally, as noted by the ALJ (Tr. 535) Plaintiff's indicates that she had no problem with her personal care (Tr. 125, 484) and that she was able to clean her house (Tr. 126), do laundry (Tr. 126), grocery shop (Tr. 127), get her 10-year-old son ready for school (Tr. 124-25), watch television (Tr. 124, 128), cook (Tr. 58), and do dishes (Tr. 58). Plaintiff also indicates that she enjoys eating out (Tr. 808) and that her abilities and interests included reading mystery novels (Tr. 803; see also Tr. 128), going to the library (Tr. 803), walking (id.), and swimming (id.). In response to a question from her attorney concerning her daily activities, Plaintiff testified "I don't need any help at all" and "I do everything for myself" (Tr. 58). Plaintiff further admitted that she is "pretty good" at following written instructions (Tr. 129) and that she handles changes in routine "all right" (Tr. 130). In addition, Plaintiff admitted that she spends time with others "maybe once a week" (Tr. 128); feeds her cat (Tr. 125); and is able to pay bills, use a checkbook, and handle a savings account (Tr. 127). Plaintiff also admitted that she had a hobby, she

had a friend with whom she could confide, she had a support system in her community, and she was able to stick to a budget (Tr. 808). As the Fourth Circuit explains, Plaintiff's ability to engage in these activities is substantial evidence that he is not disabled. See Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005) (upholding finding that claimant's routine activities – including visiting relatives, reading, watching television, cooking, feeding pets, cleaning the house, managing household finances, and washing clothes – were inconsistent with complainant's alleged inability to work); Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("the pattern of [claimant's] daily activity" – including socializing, grocery shopping, cooking, washing dishes, generally taking care of a house, walking to town, and taking care of personal needs – "suggests that he was not disabled from working"). Finally, Dr. Valite's report in January 2007 noted that, despite a depressed mood and a flat affect, Plaintiff was alert, fairly-groomed, and cooperative; her speech was normal in cadence and was mostly clear and coherent; her thoughts were goal oriented; she had good impulse control; she had fair insight and judgment; she was alert and oriented to all spheres; she had good abstraction; she had good concentration; she had no psychomotor abnormality; she denied any auditory hallucinations or acute suicidal or homicidal thoughts; and she had no memory deficits (Tr. 543, referring to Tr. 298; see also Tr. 299, 300, 301, 302). The opinions of Drs Ronin and Price which are given great weight by the ALJ are consistent with these other findings in the record made by Plaintiff's treating physicians. Accordingly, having concluded that the opinion evidence was appropriately considered and evaluated, the Court finds that the RFC and ultimate decision by the ALJ in this case is supported by substantial evidence.

### III. CONCLUSION

This court is charged with reviewing the case only to determine whether the findings of the

38

Commissioner were based on substantial evidence. <u>Richardson</u>, 402 U.S. at 390. Even where the Plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. <u>Blalock</u>, 483 F.2d at 775. The Commissioner is charged with resolving conflicts in the evidence, and this court cannot reverse that decision merely because the evidence would permit a different conclusion. <u>Shively v. Heckler</u>, 739 F.2d at 989. As previously discussed, despite the Plaintiff's claims, she has failed to show that the Commissioner's decision was not based on substantial evidence. Based upon the foregoing, and pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631 (c) (3) of the Social Security Act, 42 U.S.C. Sections 405 (g) and 1338 (c) (3), it is, RECOMMENDED that the Commissioner's decision be **AFFIRMED**.

Respectfully submitted,

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

January 12, 2015
Florence, South Carolina